IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHESTER MARSHALL and | ) | |
| RICHARD WHITBY, individually | ) | |
| and on behalf of a class of | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 10-cv-0011-MJR-SCW |
| | ) | |
| AMSTED RAIL COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

REAGAN, District Judge:

### A.   Introduction

The Fair Labor Standards Act (FLSA), 29 U.S.C. 201, et seq., provides that employers "must pay overtime to employees working on an hourly basis." *Kennedy v. Commonwealth Edison Co.,* **410 F.3d 365, 369 (7th Cir. 2005).**  If an employee works more than 40 hours a week, he is entitled to one and one-half times his regular wage for every extra hour worked.  *See* **29 U.S.C. 207(a)(1).**  The employee bears the burden of proving that he performed overtime work for which he was not properly compensated. *Kellar v. Summit Seating Inc.,* **664 F.3d 169, 173 (7th Cir. 2011).**

Amsted Rail, Inc. (Amsted) manufactures freight car and locomotive undercarriage components at a production facility in Granite City, Illinois.  In January 2010, two hourly-paid employees, both union members working at the Granite City plant (Chester Marshall and Richard Whitby), filed suit in this District Court alleging

that they and similarly situated coworkers are entitled to recover unpaid wages and overtime compensation from Amsted under the FLSA and the Illinois Minimum Wage Law, 820 ILCS 105/1, et seq.

The original complaint listed 65 employees other than Marshall and Whitby who had opted into the lawsuit, as is required for a plaintiff to join an FLSA collective action. The count based on Illinois law was dismissed in an Order which directed Plaintiffs to file an amended complaint (*see* Doc. 72).   They did so, various motions were filed and resolved, more Plaintiffs opted into the suit (by last count, totaling 478, *see* Doc. 229), and the Court conditionally certified this suit as a collective action.  Additional motions were filed, briefed, and ruled on by the Court.

In November 2011, the undersigned Judge stayed this action pending resolution by the United States Court of Appeals for the Seventh Circuit of an employer's interlocutory appeal of a summary judgment ruling in a FLSA case pending in the Northern District of Indiana -- *Sandifer v. United States Steel Corp.*, **678 F.3d 590 (7th Cir. 2012).**  After *Sandifer* was decided on May 8, 2012, the undersigned District Judge lifted the stay of this action, granted a motion to reconsider a summary judgment ruling issued herein, and adjusted the schedule for filing the remaining motions (s*ee* Doc. 204).

Jury trial now is set for December 3, 2012, and two motions are pending.  First, the Court addresses Amsted's July 16, 2012 motion for class decertification (Doc. 210), which was extensively briefed, became ripe with the filing of supplemental reply briefs on November 2 and 9, 2012, and was the subject of oral arguments on October 26, 2012. As explained below, the Court grants the motion.

### B.    <u>Factual and Procedural Overview</u>

Amsted, who employs hundreds of hourly workers at the Granite City facility, pays its employees based on their scheduled shift times, not their actual hours worked. Plaintiffs allege that during the time period relevant to this lawsuit, Amsted required them to work before and after their paid shifts (as well as during lunch breaks) without compensation.  The pre-shift work included donning protective gear, obtaining tools and supplies, testing equipment, obtaining tool repairs or replacements, and organizing their work areas.  The post-shift work included shutting down machinery, storing tools, cleaning work areas for the following day/shift, shoveling sand, blowing debris off themselves, and doffing protective gear.

Plaintiffs contend that these tasks are integral and indispensable to the performance of their assigned duties, meriting compensation.  They assert that Amsted willfully failed to pay wages and overtime compensation, while enjoying substantial profits at the expense of the hourly-paid employees undertaking these tasks, and also that Amsted failed to keep accurate payroll records.  Plaintiffs seek to recover compensatory damages (the unpaid wages and overtime compensation), plus liquidated damages, attorney's fees and costs under § 16(b) of the FLSA, and pre-judgment and post-judgment interest.

Amsted filed a motion for partial summary judgment directed to Plaintiff's claims for donning and doffing personal protective equipment (PPE).  Amsted sought summary judgment on two separate grounds.  In September 2011, the undersigned Judge granted the motion on the first ground, finding Plaintiffs' claims for

compensation based on time donning and doffing PPE barred by § 203(o) of FLSA, because Amsted had proven a custom or practice under a bona fide collective-bargaining agreement which excluded the time spent donning and doffing from the "hours worked" by Plaintiffs (*see* Doc. 180, pp. 22-23).

In June 2012, after the Seventh Circuit decided *Sandifer*, the undersigned Judge granted summary judgment for Amsted on the second ground advanced.  The Court found that because the time donning and doffing PPE fell under § 203(o), *as a matter of law* it could not constitute a "principal activity" under the FLSA (*see* Doc. 204, p. 5).  The Court solicited the parties' positions on what remained for trial at that point, speculating that with the donning/doffing claims out, what remained was the question of compensation for *other* pre-shift and post-shift activities, like starting machinery, obtaining supplies, and repairing tools.  The parties filed a Joint Report (Doc. 203).

In that report, Plaintiffs identified the remaining issues as:  "(1) Amsted's liability under the FLSA, (2) Amsted's willfulness in violating the FLSA, and (3) Plaintiffs' damages" (Doc. 203, p. 1).  Plaintiffs acknowledged that *Sandifer* put the kibosh on their argument "that the uncompensated donning and doffing performed by the Plaintiff class starts or ends the compensable workday" but maintained that *Sandifer* left intact their "primary argument all along that Amsted's time clock records (which it does not use for payroll purposes) reasonably approximate the amount of work performed by the class" (*id.*).

Defendants identified two sets of questions remaining – the first being whether the conditional class must be decertified, and the second focusing on the nature of each

Plaintiff's pre-shift and post-shift activities (i.e., were those tasks integral and indispensable? were they *de minimis*? was Amsted entitled to a statutory credit/offset under one or more of the collective bargaining agreements for this work?). Counsel also moved for summary judgment and to exclude witnesses. Having denied Amsted's summary judgment motion on November 3, 2012, the Court now resolves the question of decertification.

### C.   Summary of FLSA Certification Process

Congress expressly authorized the certification of collective actions in the FLSA. **29 U.S.C. 216(b).** Collective actions are treated as the equivalent of class actions in most aspects. The principal difference is that in a collective action, unnamed plaintiffs must *opt in* to be bound by a judgment, whereas in a class action plaintiffs must *opt out* to escape being bound. *Epenscheid v. DirectSat USA, LLC,* **688 F.3d 872, 877 (7th Cir. 2012).** Collective actions are certified and decertified like class actions, "unaffected by the absence of a governing rule of procedure." ***Id.*** And if an FLSA collective action is decertified, "it reverts to one or more individual actions on behalf of the named plaintiffs." ***Id., quoting Alvarez v. City of Chicago,* 605 F.3d 445, 450 (7th Cir. 2010).**

Federal district courts enjoy wide discretion to manage collective actions. ***Alvarez,* 605 F.3d at 449, *citing Hoffmann-LaRoche v. Sperling,* 493 U.S. 165, 171 (1989).** As mentioned above, the FLSA authorizes employees to act together to seek redress for minimum wage and maximum hour provisions. Proceeding via collective action can be appropriate even if the plaintiffs have different subclaims. "If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any

given plaintiff may be determined by only a subset of those common questions." *Alvarez,* **605 F.3d at 449.**

On the other hand, proceeding by collective action has been held inappropriate where: (a) determining whether any given plaintiff has a viable claim depends on a detailed, fact-specific inquiry (and some plaintiffs lack any conceivably viable claim altogether); (b) employees are subject to "vastly disparate employment situations," and the defense likely will center on factors specific to each employee; or (c) despite common questions as to liability, the remedy is narrowly tailored as to each particular plaintiff/employee.  *Alvarez,* **605 F.3d at 449, *citing Jonites v. Exelon Corp.,* 522 F.3d 721, 725-26 (7th Cir. 2008), and *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1214-15 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003).**

More specifically, the FLSA allows the claims of "similarly situated employees" to proceed in a collective action.  But the FLSA and regulations promulgated thereunder do not define similarly situated or furnish a test for whether FLSA claims qualify to proceed as a collective action.  As explained in a prior Order in this case, a majority of district courts employ an *ad hoc* two-step process to determine whether to certify a collective action under the FLSA (*see* Doc. 81, pp. 7-8, collecting cases).

Step one of the process is *conditional* certification, the purpose of which is to decide whether the proposed class should be notified of the pending action.  At step one, with discovery not yet complete, the court's determination is made based on the pleadings and any declarations or affidavits submitted by the parties.  The named or

"representative" plaintiffs need only make a threshold showing that the putative plaintiffs are similarly situated.   *See, e.g., Morgan v. Family Dollar Stores, Inc.,* **551 F.3d 1233, 1260-61 (11th Cir. 2008),** *cert. denied,* **130 S. Ct. 59 (2009) (representative plaintiff needs to show only a "reasonable basis" for his claim that there are similarly situated employees);** *Barfield v. New York City Health & Hosp. Corp.,* **537 F.3d 132, 137 (2nd Cir. 2008)("modest factual showing" needed at step one).**

The standard for conditional certification is "fairly lenient," and the plaintiff's burden is "not a high one," requiring the representative plaintiff to merely show "some factual nexus that connects him to other potential plaintiffs as victims of an unlawful practice" (*see* Doc. 81, p. 9).  If this showing is made, notice is mailed to potential opt-in claimants.  In other words, conditional certification is the mechanism used by district court to establish whether potential plaintiffs in an FLSA action should be sent a notice of eligibility to participate in a collective action.  *Ervin v. OS Restaurant Services, Inc.,* **632 F.3d 971, 974 (7th Cir. 2011).**  This Court granted conditional certification in June 2010 (*see* Doc. 81).

Step two takes place later, typically at the close of discovery, at which point the court examines closely, on a fully developed record, whether the class members actually are similarly situated.  *See Anderson v. Cagle's, Inc.,* **488 F.3d 945, 953 (11th Cir. 2007),** *cert. denied,* **553 U.S. 1093 (2008).**  "At this point, the district court has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity."  *Morgan,* **551 F.3d at 1261.**

Step two sometimes is referred to as *final* certification.  ***See, e.g., Zavala v. Wal-Mart Stores, Inc.,* 691 F.3d 527, 534 (3rd Cir. 2012).**  A more stringent test governs step two.  ***Zavala,* 691 F.3d at 534 ("we have made clear that the standard for final certification is more stringent than the standard for conditional certification….");** *Thiessen v. General Electric Capital Corp.,* **267 F.3d 1095, 1103 (10th Cir. 2001).**

This past August, the Court of Appeals for the Third Circuit addressed this issue in detail, holding "that plaintiffs must satisfy their burden at this second stage by a preponderance of the evidence….  [And] the task on final certification is determining 'whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs.'"  ***Zavala,* 691 F.3d at 537,** *quoting Myers v. Hertz Corp.,* **624 F.3d 537, 555 (2nd Cir. 2010),** *cert. denied,* **132 S. Ct. 368 (2011).**  **See also** *O'Brien v. Ed Donnelly Enterprises, Inc.,* **575 F.3d 567, 584 ("The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs.").**

Although the Seventh Circuit has not announced a test to determine this FLSA "similarly situated" question, other Courts of Appeal have identified or approved a number of factors to guide district courts at stage two of the certification process.  Those factors are discussed below in Section D of this Order.  Clearly, though, to secure final certification (or avoid *decertification*), plaintiffs "must rely on more than just 'allegations and affidavits'" and must show that the similarities among the potential class members "'extend beyond the mere facts of job duties and pay provisions' and encompass the defenses to some extent."  ***Morgan,* 551 F.3d as 1261-62,** *quoting Anderson,* **488 F.3d at 953.**  **See also** *Steinberg v. TD Bank, N.A.,* **2012 WL 2500331, \*\*5-6 (D. N.J. 2012).**

If the plaintiffs satisfy their burden, the case may proceed to trial as a collective action. *Zavala*, **691 F.3d at 537,** *citing Symczyk v. Genesis HealthCare Corp.*, **656 F.3d 189, 193 (3rd Cir. 2011).** If the plaintiffs fail to shoulder their burden, the collective action must be decertified, at which point the case reverts to one or more individual actions brought by the named plaintiffs. *Alvarez*, **605 F.3d at 450.**

### D.    Application to Amsted's Motion for Decertification

The undersigned Judge granted conditional certification after finding – under the modest standard applicable to that stage -- that this lawsuit challenges one company policy, applicable to all hourly workers, involving their pre-shift and post-shift work. Now, with discovery completed and a voluminous record (including written discovery responses, questionnaires, and deposition testimony), this Court's task is to ascertain – under the heightened standard governing final certification – whether the 476 opt-in Plaintiffs are similarly situated to the 2 named/representative Plaintiffs.

Plaintiffs urge an affirmative answer to this question, noting that Amsted has a single policy to compensate workers only for time spent during their scheduled shifts, and that this policy applies to each opt-in Plaintiff, all of whom work in a single facility, in a single employment setting, subject to the same corporate practices. In other words, Amsted's policy of paying scheduled shift time instead of actual time worked is a common policy or practice which is amenable to certification. Although Plaintiffs "held different jobs and performed different job duties," that "has no material impact on whether they are similarly situated with respect to being required to work off-the-clock" (Doc. 219, p. 4).

Plaintiffs further assert that judicial efficiency is best served by trying these cases collectively, otherwise there are "nearly 500 individual cases, most of which are worth less than $5,000 standing alone" (Doc. 219, p. 22).

Amsted contends that final certification is not warranted and that Plaintiffs' claims should be *de*certified, because they cannot be fairly litigated in a collective manner.  Amsted points out that the "480 individuals who joined this action worked in more than 80 distinct jobs, … engaged in a wide array of work-related tasks, … [and] exercised autonomy regarding the manner in which [they] performed [their] work" (Doc. 211, pp. 1-2).  Thus, Amsted contends, the fact-intensive questions destroy any ostensible efficiency of a collective trial, and the hopeless heterogeneity of Plaintiffs' jobs renders a mass trial both unfair and unmanageable.

As stage two of the certification process, the district court should assess three key factors:

> (1) the employment settings of the individual plaintiffs;
> (2) the defenses available to the defendant; and
> (3) fairness and procedural considerations.

***Morgan*, 551 F.3d at 1261; *Anderson*, 488 F.3d at 953; *Thiessen*, 267 F.3d at 1103; *O'Brien*, 575 F.3d at 584.**

District courts within the Seventh Circuit have reviewed these factors in undertaking the step two certification analysis:  (1) whether plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff or apply across the board; and (3) fairness and procedural concerns presented by

proceeding as a collective group.  *See, e.g., Camilotes v. Resurrection Health Care Corp., -- F.Supp.2d --, 2012 WL 4754743, *4 (N.D. Ill. October 4, 2012); Hawkins v. Alorica, Inc., -- F.Supp.2d --, 2012 WL 4391095, *6 (S.D. Ind. Sept. 25, 2012); Cottle v. Falcon Holdings Mgt., LLC, -- F.Supp.2d --, 2012 WL 4243644 (N.D. Ind. Sept. 20, 2012); Franks v. MKM Oil, Inc., -- F.Supp.2d --, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012); Mielke v. Laidlaw Transit, Inc., 313 F.Supp.2d 759, 762 (N.D. Ill. 2004).*

■     **The Employment Settings of the Individual Plaintiffs**

Looking to those factors, this Court first examines Plaintiffs' positions and job duties.  Amsted manufactures train undercarriage components, including side frames, bolsters, couplers, knuckles and yokes.  Amsted's workforce at the Granite City facility is divided into multiple departments.  The Plaintiffs in this case work in nine different departments, including (1) Molding, (2) Cleaning and Finishing, (3) Building and Equipment, (4) Quality Assurance, (5) Yard, (6) Core, (7) Melted Metals, (8) Pattern, and (9) Small Parts.  Different types of workers are employed within the separate departments – for instance, the Building and Equipment (B&E) Department includes both machinists and electricians.

Additionally, different collective bargaining agreements (CBAs) cover different employees.  Again, by way of example, machinists working in the B&E Department are subject to a CBA between Amsted and the International Association of Machinists and Aerospace Workers, District 9.   Pattern makers in the Pattern Department are covered by a CBA between Amsted and the International Association of Machinists and Aerospace Workers, Pattern Makers Union, Local 688.   The bulk of the employees at

Amsted are covered by a third CBA – executed between Amsted and the United Steelworkers, Local Union No. 1063.

Each CBA differs with respect to rates of pay, overtime, and hours worked.  This means that members of different bargaining units are differently compensated.  Some Plaintiffs are paid a regular hourly wage under their CBA plus overtime premiums, while other Plaintiffs receive incentive-based wages, depending on their specific job title, with incentive rates which differing by product.   Certain Plaintiffs are paid under a combination of these compensation systems.

All opt-in Plaintiffs are subject to the same Shop Rules and Regulations, are required to comply with a New Employee Handbook, are paid hourly, and must clock in before the start of their shift.  Amsted has six time clocks located throughout the Granite City plant.   The time clock punches are tracked in a "clock ring report" maintained by Amsted.  The time clocks are used primarily to track attendance, not to record actual time worked for payment purposes.[1]   Due to the fact that different jobs fall within different points in the production process, scheduled start times are staggered by department.

Employees are allowed to clock in up to 29 minutes *before* the start of their scheduled shifts and to clock out up to 29 minutes *after* their shifts end.  Employees can arrive and clock in before their shift starts, but they must be in their own department, ready to work, at the beginning of their scheduled shift.   Employee practices vary in

---

[1]    Employees are paid based on their scheduled shift times and manual computer entries made by department supervisors.

terms of such aspects as when they clock in and out, where they clock in and out, and whether they put on their PPE before or after clocking in.  Other habits and practices vary by worker, like the time spent walking from time clocks to work stations, and what employees do on the way to their work stations.

The parties dispute the actual number of different jobs done by Plaintiffs (and thus the degree of similarity amongst the Plaintiffs).   Amsted posits that "Plaintiffs worked in *more than eighty (80) unique jobs* – each with different, and distinct, job duties" (Doc. 211, p. 8, citing Dockery Declaration, Exh. 14 at ¶¶ 4-5).   Plaintiffs claim that this is an exaggerated number, because some of the same jobs have different titles.  Plaintiffs insist that the jobs of "Power Trucker, Floor man-Trucker, Order Puller, Material Handler, Power Tractor Operator, Power Tractor Operator-Slag Pit, Power Trucker, and Casting Transfer Operator" which are separately titled positions share the identical duty of operating a power industrial vehicle (Doc. 218, p. 16).

What cannot be disputed here is that the 478 Plaintiffs performed a wide array of tasks and duties, ranging from collecting trash to operating blast furnaces.   The Plaintiffs include, *inter alia*, Shop Machinists who handle routine maintenance (like greasing and oiling) of machinery and tools, T-Car Operators who drive rail cars delivering parts throughout the plant, Carbon Arc Operators who use carbon arc guns to remove defects from steel casings, Electric Furnace Operators who melt metal, and Inspectors who perform quality assurance functions.   The work performed by (and tools and equipment used by) the Plaintiffs differs significantly from job to job and person to person.

Plaintiffs' counsel suggests that all Plaintiffs' pre-shift and post-shift activities fall into five categories:  (1) picking up and returning tools; (2) starting/connecting and stopping machinery and equipment; (3) cleaning work stations; (4) performing maintenance and servicing tools and equipment; and (5) shoveling sand and removing debris.  Plaintiffs' counsel further notes that although each Plaintiff does not perform all of these tasks, "every Plaintiff performs at least one of these tasks outside his scheduled shift," and every Plaintiff performs the first or second task each day (Doc. 218, pp. 9-10).

Yet, as Amsted correctly notes, discovery revealed no set pattern or established routine among Plaintiffs as to their tools and equipment.   Some gathered tools and equipment before their shift each day, while some did this only once a week.  Some Plaintiffs spent only a minute getting one item from a nearby source, others spent eleven minutes gathering items such as grinders, chipping hammers, and sand blowers from further locations before their shifts began.

This lack of pattern also is seen in the Plaintiffs' testimony regarding cleaning their works areas, starting up their machinery, and performing postliminary tasks. Even within a single *position*, differences exist which are relevant to the ultimate inquiry at trial.  For instance, of the five Plaintiffs who worked the "Chainman 2nd" position, four did *not* service their tools each day, but the fifth spent *45 minutes per day* servicing his tools before his shift started (*see* Doc. 211, p. 18, citing Questionnaire responses from A. Webster, K. Guyton, M. Ryan, B. Seales, and D. Jones).

These differences are significant for reasons related to the jury trial.   The Plaintiffs seek to recover for preliminary and postliminary tasks such as obtaining and

storing tools, starting up and shutting down machinery, and cleaning and organizing their work areas.   To avoid decertification, Plaintiffs must demonstrate that they are similarly situated one to the other such that their claims can be collectively adjudicated. However, compensation is required under the FLSA only for preliminary and postliminary work that is ***integral and indispensable*** to an employee's primary job duty, s*ee, e.g., Lopez v. Tyson Foods, Inc.,* **690 F.3d 869, 874 (8th Cir. 2012),** *citing* **29 U.S.C. 254(a),** and *IBP, Inc. v. Alvarez,* **546 U.S. 21, 26-28 (2005).** [2]

Also, activities that require only a *de minimis* amount of time are not compensable under the FLSA.  ***Sandifer v. U.S. Steel Corp.,*** **678 F.3d 590, 593 (7th Cir. 2012)("It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.");** *Kellar v. Summit Seating, Inc.,* **664 F.3d 169, 176 (7th Cir. 2011) ("The** *de minimis* **doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute.").**

In the case *sub judice*, a determination ultimately must be made as to each Plaintiff's tasks, duties, and compensation, to assess whether that particular Plaintiff

---

[2]        The FLSA set the standard workweek at 40 hours and required employers to pay their non-exempt employees one and one-half times their regular rate of pay for any hours worked in excess of that.  ***Urnikis-Negro v. American Family Property Services,*** **616 F.3d 665, 666 (7th Cir. 2010),** *cert. denied,* **131 S. Ct. 1484 (2011),** *citing* **29 U.S.C. 207(a)(1).**  Congress responded in 1947 by passing the Portal-to-Portal Act, **29 U.S.C. 251-262.**  The Portal-to-Portal Act excused employers from compensating employees for time spent traveling to and from the place they perform their principal activities *and* eliminated employer liability for time engaged in "preliminary" or "postliminary" activities (which occur before or after the employee engages in his "principal" activity).  **29 U.S.C. 254(a);** *Kellar,* **664 F.3d at 173-74.**

was denied payment for activities that were integral and indispensable to *his* principal activity (and that do not fall under the *de minimis* doctrine).   But the employees' principal activities and job duties are not the same from Plaintiff to Plaintiff, even within a single department.

Recently, in **Camilotes, 2012 WL 4754743,** the Northern District of Illinois granted the defendant's motion to decertify an FLSA collective action brought by nurses who were regularly required to work through their meal breaks.  Judge Amy St. Eve set forth the familiar three factors shaping consideration of step two certification analysis (**id. at \*4**):

> "At the second stage, the court considers: '(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns.' " *Franks,* 2012 WL 3903782, at \*9…. Plaintiffs bear the burden of demonstrating that they are "similarly situated." *See Medina,* 2012 WL 1094353, at \*2 (citing *Russell v. Illinois Bell Tel. Co., Inc.,* 721 F.Supp.2d 804, 811 (N.D.Ill.2010).

The court concluded that these factors weighed *against* final certification, because significant factual differences existed not just among the plaintiffs' employment location (the 8 named plaintiffs and 209 opt-in plaintiffs worked in eight different hospitals), but also in the plaintiffs' job duties, work settings, supervision, and meal break practices.

Judge St. Eve rejected the plaintiffs' argument that the distinctions were minor (and that the common thread was one system-wide failure to provide thirty minute meal breaks for nurses), instead declaring (**Camilotes, \*5-6, \*9, emphasis added**):

> Although Plaintiffs are all nurses, they had varying job duties and environments…. [W]hether and when Plaintiffs took meal period breaks,

and the frequency with which they took them, depended in large part upon their particular work environment and job duties….

These differences are significant because **determining whether a Plaintiff has a viable claim will require detailed and individualized factual inquiries, and those individualized issues will predominate over any issues that are common to the class.** *See Alvarez,* 605 F.3d at 449; *see also Reed v. County of Orange,* 266 F.R.D. 446, 450 (C.D. Cal. Jan. 8, 2010) (observing that "[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors," and where "the disparity between Plaintiffs' factual and employment settings … result[ed] in highly individualized questions of fact that ma[de] proceeding as a collective action impractical and prejudicial to the parties")….

Similarly, in the instant case, the undeniable differences in the 478 Plaintiffs' job titles, job duties, compensation plans, and other employment circumstances produce highly particularized claims requiring fact-specific inquiries which render it inappropriate to try them collectively.  This factor weighs in favor of decertification.

■       **The Defenses Available to Amsted**

Next the Court must "consider whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly." *Morgan,* **551 F.3d at 1262.**   Without question, Amsted's defenses will require individualized inquiries.  The defense as to each Plaintiff will entail consideration of facts and testimony unique to that Plaintiff and not subject to generalization as to the other 470-some Plaintiffs.  In such circumstances, the defenses available to the employer for one plaintiff's claim cannot serve as a proxy for the defenses available for another Plaintiff's claim.  *See Camilotes,* **2012 WL 4754743, \*12.**

This harkens back to the principle that not all work-related activities constitute "work" that must be compensated under the FLSA. ***Musch v. Domtar Industries, Inc., 587 F.3d 857, 859 (7th Cir. 2009).*** For pre-shift and post-shift tasks to be compensable under the FLSA, it will have to be shown that such activity is an integral and indispensable part of the "principal activities" for which *that particular individual* Plaintiff is employed. *See* **29 U.S.C. 254(a);** *IBP,* **546 U.S. at 40;** *Musch,* **587 F.3d at 859.**

Here, Amsted has demonstrated that there is no required series of events that begins or ends all Plaintiffs' work days, and there is no common routine among the Plaintiffs in terms of their pre- and post-shift actions. To the contrary, the Plaintiffs differ both in what they do before and after their shifts and in what their principal activities are.

This is not a case in which the defendant's defenses can be applied "across the board" to all Plaintiffs' claims. Indisputably, Amsted will present defenses that vary on a Plaintiff-by-Plaintiff basis. The record before the Court discloses that Amsted cannot adequately assert their defenses in response to representative testimony if all 478 Plaintiffs proceed via collective trial. This factor weighs in favor of decertification.

■    **Fairness and Procedural Concerns**

Moreover, in light of the substantial factual differences in the Plaintiffs' employment settings, routines, principal activities, and duties, the Court finds that it is impractical and unfair to permit this case to proceed via collective action. Endeavoring to generalize one Plaintiff's experience using another Plaintiff's situation is an inaccurate method of assessing the validity of the Plaintiffs' claims. Plaintiffs' counsel

has not shown how true "representative" testimony could be adduced in the light of the extensive diversity of circumstances. And proceeding via the representative testimony method suggested by Plaintiffs' counsel in oral argument would deprive Amsted of a meaningful opportunity to cross-examine the opt-in Plaintiffs about their specific pre-shift and post-shift activities.

Additionally, the absence of a single unifying task performed by all Plaintiffs before work without compensation (or some other connector like a specific job duty done "off the clock") necessitates the particularized liability analysis which defeats the judicial economy associated with a collective action. Moreover, a jury would be substantially burdened if asked to sit through a trial that, realistically, might last 7 or 8 weeks and involve a massive amount of detailed, Plaintiff-specific evidence -- not to mention a confusing tangle of jury instructions and verdict forms. Proceeding via collective action with all 478 Plaintiffs presents genuine manageability problems for the Court.

As was noted in *Camilotes*, **2012 WL 4754743 at \*13,** proceeding in a single collective trial here would result in "unfairness to [the defendant] and manageability problems for the Court…. While Plaintiffs' desire to litigate collective for economic reasons is understandable, it does not override the negative effects that certification is likely to have on the fairness and manageability of the proceedings." Thus, the third factor also weighs in favor of decertification.

But the Court's job does not end here. The Seventh Circuit has instructed that if proceeding as a collective is not appropriate but it appears that the plaintiffs are

prepared to proceed through separate classes, "the district court must consider whether … other mechanisms for judicial resolution of their claims are more or less efficient than a collective action comprised of various subclaims." *Alvarez,* **605 F.3d at 450.**

■      **Alternatives to Single Collective Action**

In response to the Court's questioning at the October 26th hearing, Plaintiffs' counsel submitted a brief proposing the division of this action into subclasses by department – one for each of the nine departments at Amsted in which the Plaintiffs work or worked (the various departments representing different *stages* in the manufacturing process).

Plaintiffs submit that subclassing by department makes sense in this case, because the nine resulting groups will be tailored, and each of the nine trials will be considerably more manageable. Also, this approach will allow testifying Plaintiffs to address specific tasks required in their common department, and each of the nine subclasses will be (more or less) organized by job duties: "the jobs within each department are factually and logically related to each other and, though the tasks may be somewhat different, are directed toward a single goal in the manufacturing process" (Doc. 235, p. 3).

The undersigned Judge is not persuaded that subclassing by department rectifies the problems and dangers outlined as to a collective trial of this matter.  First, the evidence before this Court does *not* show that the Plaintiffs within each department are truly "similarly situated."   To the contrary, the employment conditions and work

practices and job tasks vary widely from Plaintiff to Plaintiff *within* the nine departments.

Second, Amsted's right to present individualized defenses is not cured by breaking one large trial into nine smaller trials.  We are still faced with the highly individualized fact-specific inquiries as to nearly every Plaintiff, and counsel have not demonstrated how representative testimony can be used in this situation.  ***See, e.g., Camilotes,* 2012 WL 4754743 at \*14 ("In short, Plaintiffs' 'representative' testimony in this case would not, in fact, be representative of the class as a whole because of the myriad of factual differences surrounding whether, when, and under what circumstances Plaintiffs took meal breaks and reported missed meal breaks.").**

Third, subclassing by department does not result in a neat or clean division of Plaintiffs into separate trials, because individual Plaintiffs *work or worked in more than one department*.  This is particularly troublesome, because it opens the door to multiple recoveries by a single Plaintiff (and even inconsistent verdicts from different juries).

Furthermore, here, as in ***Jonites,*** the impediment to proceeding via subclasses is that we have necessarily individualized defenses plus the real likelihood that some Plaintiffs have no viable claim at all.   Simply put, Plaintiffs' proposal to subclass by department leaves the Court with groups of employees who have varying job duties and principal activities and who are subject to different affirmative defenses that cannot be applied to the subclass as a whole, resulting in unfair and unworkable trials. Plaintiffs have expressed their openness to subclassing via any other system the Court prefers, but they have not identified any method "sufficient to allay the Court's

manageability and fairness concerns, especially given the plethora of individualized factual issues in this case." *See, e.g., Camilotes,* **2012 WL 4754743 at \*13.    N**or has the undersigned found a way to devise appropriate subclasses for Plaintiffs.

The Court has considered a variety of alternatives to fairly present and effectively manage the claims of the 478 plaintiffs, including (a) mass adjudication via collective trial, (b) subclassing by department, job classification and/or union affiliation, and (c) bifurcating damages and liability.   Having fully considered Plaintiffs' arguments, the Court finds none of these methods to be appropriate, equitable or economical here.  On the facts of this case, decertification is the only viable option.

### D.    <u>Conclusion</u>

For all these reasons, the Court **GRANTS** Amsted's motion for class decertification (Doc. 210). The Court **DISMISSES without prejudice** the 476 opt-in Plaintiffs (all Plaintiffs *other than* Chester Marshall and Richard Whitby). Marshall and Whitby alone may proceed herein on their own claims.

As another District Court expressed when decertifying a conditionally certified class four months ago:

> These various different questions of "law and fact" prevent this Court from determining that the Class is "similarly situated" for the purposes of FLSA class certification. Accordingly, defendant's motion for decertification is granted….

> This ruling does not mean that opt-in plaintiffs do not have legitimate claims for unpaid work.  This Court has simply exhausted its ability to divide the Class into easily-administrable classes of plaintiffs….

*Morano v. Intercontinental Capital Group, Inc.,* -- F.Supp.2d --, 2012 WL 2952893, *9 (S.D. N.Y. July 17, 2012).

In the instant case, trial will proceed as to the claims of Plaintiffs Marshall and Whitby on December 3, 2012, as scheduled.

Finally, to the extent it is still relevant as to the trial of the two named Plaintiffs, Amsted's motion to exclude the report and testimony of Robert Offerman (Doc. 208) is hereby **DENIED.**

"Under Rule 702, expert testimony is admissible if (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *Ortiz v. City of Chicago,* **656 F.3d 523, 536 (7th Cir. 2011), citing FED. R. OF EVID. 702 and** *Daubert v. Merrell Dow Pharm.,* **509 U.S. 579 (1993).** *See also Lapsley v. Xtek, Inc.,* **689 F.3d 802, 808-09 (7th Cir. 2012)(expert testimony must be relevant, reliable and have a factual basis before the jury may be allowed to hear it).** Rule 702 and *Daubert* require district courts to perform a gate-keeping function as to evidence offered by expert witnesses, to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael,* **526 U.S. 137, 152 (1999).**

Here, Amsted moves to exclude the opinions of Robert Offerman, a Certified Public Accountant, based primarily on the argument that Plaintiffs' "time clock" theory was precluded once the donning and doffing claims were eliminated from this case. The Court rejected that argument in its recent summary judgment ruling. Neither

*Sandifer* nor any prior ruling of this Court bars Plaintiffs from using the time clock data for all purposes whatsoever at trial.

Amsted also identifies several problems with Offerman's calculations -- e.g., his regular rate calculation may not have been based on each Plaintiff's total hours worked per week but instead on generalized data from the clock rings, leading to inflation of the resulting figures.   Additionally, Offerman initially failed to take into account Plaintiffs' unpaid 30-minute meal breaks.   After this was pointed out, Offerman submitted an amended expert report incorporating the evidence regarding lunch breaks as well as later-produced evidence regarding certain opt-in Plaintiffs which Offerman lacked when he produced the original report.   These flaws in Offerman's approach affect the weight to be given (rather than warrant the total exclusion of) his report and testimony.

Moreover, the portions of Amsted's argument focused on Offerman's methodology and reliability were largely directed to problems in generalizing from the evidence as to the two lead Plaintiffs to the situations of the 476 opt-in Plaintiffs.  Now that the trial will present only the individualized evidence as to the two lead Plaintiffs (Marshall and Whitby),  that concern has been alleviated.

Offerman's opinions – although open to vigorous cross-examination and the presentation of contrary evidence -- are relevant, are based on specialized knowledge, rest on sufficient data, are the product of reliable methods, and may assist the jurors in understanding the evidence or deciding the factual issues.    Accordingly, the Court **DENIES** the motion to exclude (Doc. 208).

IT IS SO ORDERED.

DATED November 13, 2012.

s/ **_Michael J. Reagan_**

Michael J. Reagan
United States District Judge